521 So.2d 1278 (1987)
William SHAW
v.
STATE of Mississippi.
No. 57177.
Supreme Court of Mississippi.
December 9, 1987.
Rehearing Denied April 6, 1988.
J. Max Kilpatrick, Philadelphia, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Billy L. Gore, Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
*1279 DAN M. LEE, Presiding Justice, for the Court:
William Shaw appeals from the Circuit Court of Neshoba County wherein he was convicted of murder in the September 7, 1985, shooting death of Arnold Milam. The case was tried November 6 and 7, 1985 in Attala County on a change of venue from Neshoba County. Shaw assigns these errors on appeal:
I. THE COURT ERRED IN NOT QUASHING THE INDICTMENT BECAUSE NO RECORD OF WITNESSES SWORN BEFORE THE GRAND JURY WAS FILED WITH THE COURT AS REQUIRED BY STATUTE.
II. THE TRIAL COURT ERRED IN ALLOWING THE STATE TO INTRODUCE EVIDENCE OF ANOTHER AND SEPARATE OFFENSE.
III. THE COURT ERRED IN OVERRULING DEFENDANT'S OBJECTION TO ANY TESTIMONY CONCERNING THE BULLET MARKED FOR IDENTIFICATION "4" TO THE TESTIMONY OF DEPUTY GREG GEORGE BECAUSE THE SAME HAD NOT BEEN PRODUCED PRIOR TO TRIAL IN VIOLATION OF A STANDING ORDER OF DISCOVERY OF THE CIRCUIT COURT OF NESHOBA COUNTY, MISSISSIPPI, AND AFTER NUMEROUS REQUESTS FROM DEFENSE COUNSEL.
IV. THE COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR A DIRECTED VERDICT AND REFUSAL OF DEFENDANT'S INSTRUCTION NO. 1 AND DEFENDANT'S INSTRUCTION NO. 17.
Finding no errors, we affirm.
William Shaw was divorced from Mary Bell Shaw on May 26, 1981; thereafter, they lived separately but near each other in Neshoba County in the Rockey Hill Community several miles outside Philadelphia, Mississippi.
Saturday, September 7, 1985, Mary Bell Shaw and Arnold Lee Milam were found shot to death at or near Mary Shaw's home. Milam was found in a pool of blood in the kitchen, a gunshot wound to his head. Mary Bell Shaw was found in a road some 70 to 75 yards away from the house.
Somewhere between 5 and 6 p.m., that day five men were hunting doves in the field which lay across an access road from Mary Bell Shaw's house with her permission. Three of the hunters heard what sounded like a scream for help coming from the general direction of Mary Bell Shaw's house. After the scream there was a pause and there followed what sounded like a gunshot.
Soon William Shaw appeared in the field. William told the five to accompany him back to the house. In his right hand he carried a pistol.
The group went back to the access road and spotted Mary Bell Shaw lying in the road, motionless. They walked past without stopping to check on her as William led them up to the house. William entered alone and the men heard nothing for five to ten minutes until he emerged.
When Shaw returned, he offered to show one of the hunters another body inside. When Leverett declined the offer, Shaw made a disparaging remark about his ex-wife and the second body inside the house, later identified as Milam.
When Shaw came out he put the pistol in his britches and said, "don't nobody come in this house." He said he was sorry they had to see that, but someone would be out soon to clean up the mess. Shaw then departed.
Sometime around 6:10 p.m., the Neshoba County Sheriff's Department dispatcher received a telephone call from someone identifying himself as William Shaw who left his name since the Sheriff was not available. The same caller called back ten minutes later and left his telephone number. During the second call, the man said, "I need someone out here ... I don't guess it will hurt to tell you. I have just killed two people."
*1280 Deputy Gregg George returned to the office about 6:28 or 6:30 and the phone rang again. The man talked with George this time. The man identified himself as Shaw and said he needed to speak with George real bad. George told him he would be out there and the man hung up, but called back within the next few minutes. This time the man again stated he had killed his ex-wife and another man. George and a constable then drove to the house.
George first saw a crowd gathered around the body of Mary Bell Shaw as he drove up. He stopped to check for a pulse but she had none. The body was cool. She was barefoot.
When George approached the house, the first thing he noticed were globs of blood leading out from the kitchen to the carport. Inside, George found the body of Arnold Lee Milam of Meridian. His body lay near a partition wall separating the kitchen from the den. His head lay in a pool of blood. A chair in the kitchen was overturned and had blood stains on it. On the kitchen table were two plates of food. It appeared someone had tracked through the blood.
Neshoba County Sheriff Glenn Waddell soon arrived. Waddell and George drove to Shaw's house and arrested Shaw. He pulled from his pants a revolver which he turned over to George. George read him the Miranda warnings and they escorted him back to Philadelphia.
State Medical Examiner Thomas Bennett testified that the same bullet caused both a wound to Milam's right arm and the fatal wound to the head. The bullet entered the arm about 1 1/2 inches below the elbow, exited at the fold of the elbow, tumbling, and entered the right cheek just below the eye.
The wounds aligned in what would appear to be a defensive position of having his arm in front of and slightly below the face, Bennett said, although it is possible the arm could have been extended in a struggle, though still flexed. Milam also could have been standing over someone or lying down. Bennett retrieved a bullet fragment during an autopsy which he could classify as coming from a medium caliber weapon, such as a .357-,.32-, or .38-caliber weapon.
Mike Allen, ballistics expert for the Mississippi Crime Laboratory, testified for the state. He identified the gun taken from Shaw as a .38-caliber weapon. Allen testified that he made a comparison test of the fragment he received from Bennett's office with other bullets test-fired from the gun. The record does not indicate Allen actually gave his opinion, though the trial judge stated before the jury that he heard Allen affirmatively answer a question asking whether the bullet came from Shaw's gun.
Shaw took the stand in his own defense and testified that he went to the house that day because Mary Bell had called him, stating that his mule and horses had gotten loose. He said he took his gun out of his truck after receiving no answer at the door because he feared Milam's unfamiliar truck meant an intruder. Mary Bell Shaw saw him and called him to the field, where an argument ensued among Shaw, Milam and Mary Bell. Shaw said he and Milam wrestled over his gun and it discharged, wounding Mary Bell. Shaw said he tended to Mary Bell and then ran to the house to seek help. When he entered, he said, Milam grabbed him by the throat and began choking him. Shaw said he fired in self-defense because he feared he would be choked to death by the bigger man. Milam stood 6'3" and weighed approximately 220 pounds, while Shaw is six feet tall and weighed about 170 pounds.
Shaw denied virtually every statement attributed to him, though he did acknowledge telling a deputy that "two people had been shot," and he did admit making a disparaging remark about Milam's remains.
The trial court granted self defense, murder and manslaughter instructions. The jury returned a verdict finding Shaw guilty of murder as charged, and Shaw was subsequently sentenced to life in prison, the sentence to run consecutive to his conviction of murder of Mary Bell Shaw.[1]

*1281 I. Did the Trial Court err in allowing evidence of other crimes?

II. Did the Trial Court err in failing to quash the indictment?
Both these assignments are substantially controlled by our decision affirming Shaw's conviction of murder of Mary Bell Shaw, No. 57,181, decided September 16, 1987 (not yet reported).
Clearly, the two deaths were inextricably linked and integrally related. The acts were so intertwined that they could not be separated between the killing of Milam and Mary Bell Shaw. See Johnson v. State, 416 So.2d 383 (Miss. 1982). We note that Shaw's trial predated the effective date of the Mississippi Rules of Evidence, effective January 1, 1986. Our decision would be no different under the new rules, however. See Rules 401, 403 and 404(b), M.R.E.
Likewise, the list of witnesses sworn before the grand jury was filed in the circuit clerk's grand jury docket prior to Shaw's trial. This complies with Miss. Code Ann. § 13-5-63 (1972) and Rule 2.01, Unif.Crim.R.Cir.Ct.P. Shaw suggests no actual prejudice and we find none. We are not called upon here to decide what, if any, vitality is left in the cited provision in light of the recent enactments extending the terms of grand juries. See Miss. Code Ann. § 13-5-39 (Supp. 1986), 1983 Miss. Laws chpt. 499 and 1984 Miss. Laws, chpt. 351. We here decide only that this provision was met and the practice of returning this list with the indictment should not be discouraged.
Both of these assignments are denied.

III. Did the Trial Court Err in Allowing Testimony Concerning a Bullet Which was Taken from Milam's Body and Not Produced in Discovery?
A bullet taken from Milam's body and marked Exhibit 4 for identification was not admitted into evidence because the state failed to provide it in discovery. Here Shaw assigns as error testimony concerning ballistics comparisons of this bullet with bullets test-fired from Shaw's revolver.
As noted previously, it does not appear that ballistics expert Mike Allen actually gave an opinion as to the projectile's origin. Any testimony or any misstatement by the trial court is not reversible error here, however.[2]
In Thomas v. State, 488 So.2d 1343 (Miss. 1986), this Court stated "[f]ailure to permit defendant's counsel to inspect physical evidence requested pursuant to 4.06 makes such physical evidence `and testimony concerning (it) ... inadmissible....'" Id. at 1344. However, this assumes that a proper objection is made and our procedure is followed as outlined in Box v. State, 437 So.2d 19, 23-26 (Miss. 1983) (Robertson, J., specially concurring). See also our cases outlining and applying the Box procedure: Cole v. State, DP-58, decided July 29, 1987 (not yet reported); Griffin v. State, 504 So.2d 186 (Miss. 1987); Watts v. State, 492 So.2d 1281, 1290 (Miss. 1986); Hall v. State, 490 So.2d 858, 859 (Miss. 1986); Gray and Nations v. State, 487 So.2d 1304, 1313-14 (Miss. 1986); Cabello v. State, 471 So.2d 332, 343 (Miss. 1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986).
Here, defense counsel objected before Allen took the stand, and he was given the opportunity to interview Allen and examine the projectile. Defense counsel also had the benefit of Allen's ballistics report well before trial. The state points out that defense counsel was supposed to report back to the trial court after interviewing Allen. A few minutes later, proceedings resumed when the defense announced, "ready." Direct examination of Allen began and defense counsel again objected to Allen's testimony and introduction of the bullet fragment into evidence.
*1282 Unlike the facts in Thomas, Shaw was familiar with the object's existence and was familiar with the state's expert witness's opinion of the physical evidence. Only the object itself was not produced. Thus, the only harm to Shaw was in his inability to subject the bullet to independent expert examination. In this case, a continuance would seem to be the only effective remedy for non-production. In this situation, however, our procedural framework in Box provides a workable safeguard for defendants which should be followed.
Under our procedure it was incumbent upon Shaw to move for a continuance if he felt unduly prejudiced. He apparently did not feel there was such prejudice after being given an opportunity to examine the bullet and interview Allen concerning his report. The record fails to indicate Shaw ever sought a continuance, and his counsel announced ready.
The trial court clearly tried to avert any prejudice to Shaw. It afforded counsel time to alleviate any prejudice and kept the bullet out of evidence. Shaw was well advised of Allen's testimony in advance and was familiar with the physical evidence. Here, the failure to move for a continuance is fatal. See Griffin v. State, 504 So.2d 186, 195 (Miss. 1987).
Further, as the state argues, the bullet was simply a non-issue. There was ample evidence, even excluding Shaw's own testimony, that he fired the fatal shot. The only issue in this trial was whether Shaw's actions were justified as self-defense.
There was no error.

IV. Did the Trial Court Err in Failing to Grant a Peremptory Instruction Based on the Weathersby Rule?
Here Shaw makes the familiar argument that he is the sole eyewitness, and his version, "if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by physical facts or by the facts of common knowledge." Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933); Simpson v. State, 497 So.2d 424, 432 (Miss. 1986). This rule is "nothing more than a restatement of the general rule" as to when a peremptory instruction is warranted. Harveston v. State, 493 So.2d 365, 371 (Miss. 1986). See also, Wetz v. State, 503 So.2d 803, 808 (Miss. 1987).
As noted previously, Shaw testified that Milam attacked and choked him as he entered the kitchen through the carport door. Shaw testified that after he fired, Milam just fell over and that was the end of it. However, Shaw could not explain how a chair at the table was overturned and how blood dripped down the chair rungs. Shaw stated the man was not seated in the chair.
Shaw also denied that he made many of the statements attributed to him by deputies Gregg George and Rayborn Rigdon and the dove hunters. Shaw also did not explain how tracks of blood leading to the carport were made, apparently by someone barefoot, testifying instead that his barefoot ex-wife had not been in the house during the shooting.
Finally, Shaw's own account and his failure to suggest accident or self defense to the dove hunters, his apparent lack of concern that either victim receive medical attention, and the physical evidence suggest Shaw's version may be unreasonable under the Weathersby rule.
In all, this was not an appropriate case for application of the Weathersby rule. To the extent we interpret Shaw to argue that the Weathersby rule should have been posed as a jury instruction, this has already been decided against him. Null v. State, 311 So.2d 654, 658 (Miss. 1975). See also, Mullins v. State, 493 So.2d 971, 973 (Miss. 1986); Berry v. State, 455 So.2d 774, 776 (Miss. 1984).
Having reviewed this case as submitted on the record from Attala County Circuit Court and having determined that there is no error therein, the judgment of the lower court  that being conviction of murder and sentence of life in the custody of the Mississippi Department of Corrections  is hereby affirmed.
AFFIRMED.
*1283 ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, ANDERSON and GRIFFIN, JJ., concur.
HAWKINS, P.J., and SULLIVAN and ZUCCARO, JJ., specially concur.
HAWKINS, Presiding Justice, specially concurring:
I concur in the affirmance of this case. In my view it was error for the circuit court to permit the ballistics expert Mike Allen to testify because of the discovery violation by the State. It makes no sense to me to require defense counsel to move for a "continuance" before he will be permitted to object to testimony resulting from a discovery violation when the "continuance" means a mistrial. In such cases, the defense should be permitted to simply object to such evidence being offered at all. Hawkins, dissenting in Cole v. State, 503 So.2d 269, (Miss. 1987); Sullivan, dissenting, Nixon v. State (Cause No. DP-65, decided November 25, 1987, and not yet reported).
The error in this case was harmless, however, as the majority notes.
SULLIVAN and ZUCCARO, JJ., join this opinion.
NOTES
[1] "Shaw I," No. 57,181, decided September 16, 1987.
[2] We note Shaw does not suggest the trial court's statement before the jury prejudiced him over and above the ultimate admission of testimony concerning the bullet fragment, and we do not address this question.