552 So.2d 841 (1989)
Philip P. SHOOK, Jr.
v.
STATE of Mississippi.
No. 07-58471.
Supreme Court of Mississippi.
October 4, 1989.
As Modified on Denial of Rehearing November 8, 1989.
*842 Grady F. Tollison, Jr., Tollison & Alexander, Oxford, for appellant.
Edwin Lloyd Pittman, Atty. Gen., Jackson, elected Supreme Court Justice January 3, 1989; Mike C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and BLASS, JJ.
BLASS, Justice, for the Court.
About one o'clock, on the morning of September 5, 1985, Cathy Thaggard was asleep in her bedroom in her parents house. Eighteen shots from a high powered rifle *843 were fired into her room, wounding her seven times and so severely that the amputation of her left hand and forearm and left leg, above the knee, was required.
The appellant, Philip Shook, Jr., who is deaf, was indicted in the Circuit Court of Tate County, on three counts of aggravated assault (§ 97-3-7, M.C.A. 1972), and one count of firing into a dwelling (§ 97-37-29, M.C.A. 1972). Pretrial motions were filed for change of venue from Tate County to Panola County, for an oral interpreter, for a delay of the trial until Shook had been taught sign language so that he could more effectively communicate with his counsel and understand the nature of the proceedings, and to suppress certain evidence seized in the course of a search made pursuant to a consent form signed by the appellant. The motion for a change of venue was not opposed by the State and was granted. An oral interpreter was appointed for the defendant. The defendant lip reads but does not know sign language. The court overruled the defendant's motion to delay trial in order to learn sign language. The court also ordered a mental and physical examination of the defendant.
Shook was convicted in the Circuit Court of the Second Judicial District of Panola County, on one count of aggravated assault and of shooting into an occupied dwelling. He was sentenced to serve consecutive terms of twenty and ten years, respectively, in the custody of the Mississippi Department of Corrections, and to pay restitution.
Appellant's motion for a new trial on the issues raised in this appeal was overruled and he has appealed.

FACTS
Cathy Thaggard met Philip Shook in the fall of 1984, when both were attending Northwest Mississippi Junior College. By Christmas they were engaged. In January of 1985, Philip transferred to Ole Miss. He and Cathy continued to see each other on the weekend, but she decided to break off the relationship. On June 20, she told Philip their engagement was off, and she returned the ring he had given her. He did not accept her rejection well.
On September 4, 1985, the Thaggard family retired for the evening after an ordinary day of work and school. At approximately 1:00 a.m., the family awoke to the sound of gun fire coming through Cathy's bedroom window. Cathy screamed for her daddy. Mrs. Thaggard testified her first thought was someone had lit a string of firecrackers. The Thaggards found Cathy partially in the hallway covered with blood, but conscious. Part of Cathy's left leg and arm had been virtually shot off.
Mrs. Thaggard tried to call for help but found that the telephone was dead. The wires had been cut. They managed to place Cathy on a board and put her in their van. The tires to Cathy's car had been shot and were flat. The Thaggards drove Cathy fourteen miles to the hospital in Senatobia. The Sheriff of Tate County was called from the hospital. He immediately began in investigation and Cathy was taken to the Baptist Hospital in Memphis.
Cathy had been shot in her left arm, her left leg, her right elbow, her right shoulder and her right upper inner thigh in her groin area. Her left hand and forearm could not be saved and were amputated. Her left leg was amputated above the knee. Most of Cathy's right elbow was blown away.
Investigators found eighteen .223 caliber cartridge casings around Cathy's bedroom window. They found that the telephone wires to the house had been cut. The officers also found tennis shoe prints around the house and leading to a pasture not far away. In the pasture the officers found tire tracks. The Thaggards suspected Shook, based upon several prior incidents with Shook at the Thaggard home, and told the Tate County police officers that the appellant was probably responsible.
On the morning of September 6, 1985, Sheriff East, of Lafayette County, brought Philip to the office at Lafayette County jail, where they met with the Tate County and Highway Patrol officers. The officers informed Philip that Cathy Thaggard had been shot and that she was alive. Orally and in writing the officers asked Philip for *844 permission to search his pick-up truck and dormitory room at Ole Miss. Philip agreed orally and then signed a consent to search form.
In the open bed of Philip's truck, parked in the public dormitory parking lot, officers found two persimmon branches. There were numerous persimmon trees in the pasture next to the Thaggard's residence. A faint shoe print was found on the bed of the appellant's truck. The pattern of the print was similar to that found near the Thaggard residence leading to the pasture where the officers earlier noted tire tracks in the mud.
In Philip's dormitory room the officers found a pair of wet, muddy blue jeans. Later that day, Philip and his father, with his son a co-owner of the truck, signed a second consent to search form permitting the officers to remove two tires from the truck and soil samples from the wheel covers. Expert testimony revealed the mud and soil samples from the blue jeans and truck were similar in texture and type to that found near the crime scene where the tracks had been found. Additionally, the tire tracks from Philip's truck were found to have a pattern similar to the tracks found in the pasture near the Thaggard's residence.
On September 9, 1985, four days after Cathy's shooting, Philip returned a "Mini 14" semi-automatic rifle to the Grenada Gunstore where he had purchased it several weeks earlier. Expert examination of the rifle and the spent cartridge shells found at the crime scene revealed that the cartridges had been fired in that gun.
It is clear from the evidence that Philip Shook, Jr. bought the gun which was used to virtually shoot off an arm and a leg of Cathy Thaggard; that he took it back after the shooting, that twenty-five shots were fired from it at the scene; that Cathy was hit seven times in the burst of gunfire into her home. Philip had threatened her after she broke off the engagement with him and returned her ring to him some months before the shooting. His truck was not in its usual parking place in the dormitory parking lot for a number of hours on the night of the shooting. When it was inspected after it came in, later, it was found to have twigs and fruit from persimmon trees in it, the same kind of trees found growing near the Thaggard home, where tire tracks were found which were made by tires with a tread very similar, at the very least, to the tires found on Philip's truck.
The appeal in this case seems to have nothing to do with the question of who shot Cathy. The jury answered that question, finding on ample evidence that it was Philip who did that. The questions raised all have to do with the trial, and some of the prior procedures, growing out of the fact that Philip is classified by audiologists as profoundly deaf. The question presented is not whether he is guilty, but how he should have been tried. This kind of question has long plagued American courts and has often made our judicial system appear to be simply incapable of dealing effectively with criminal cases.
We hold here that the jury was amply justified in finding the defendant guilty, and we affirm the finding as to the charge of aggravated assault and the charge of firing into a dwelling house. No matter how evident the guilt of the defendant may be in any case, however, such guilt must be established by acceptable means in a fair trial. We doubt that there has ever been a perfect trial but it is our duty to require, in every case, one which affords the defendant due process of law.

LAW

I.
The first assignment argues that the court should have delayed the trial until the defendant could be taught "to sign." We find this assignment to be without merit. The court had no way of ascertaining whether the defendant would learn that language nor the degree to which it could improve his real ability to understand and communicate. Philip could read, and the record shows that the interpreter kept him well informed as the trial progressed. We can appreciate that it was not easy for counsel to discuss the defense with him, *845 but, clearly it could be done. A trial should not be postponed indefinitely if any reasonable alternative exists. Additional time before the trial and breaks during the trial should be allowed, if good cause is shown, to permit counsel and the defendant to effectively communicate. No complaint on that score was made here. This record shows, beyond doubt, that the trial judge reasonably concluded that Philip could communicate with those around him sufficiently to permit him to function in a reasonably normal fashion. He was not illiterate nor blind. He is a high school graduate and was a college student. During the trial he was kept advised of what was being argued and what the testimony was. The authorities cited by counsel either arise from different factual backgrounds or support the conclusion we have set out above. People v. Myers, 46 Ill.2d 270, 263 N.E.2d 113 (1970).

II.
The second assignment of error states that the court erred when it forced the defendant to trial when he was physically incompetent and "may have been mentally incompetent" to stand trial. This assignment of error is without merit because it is totally refuted by the facts. In a case of this character, one where the defendant is suffering from the serious handicap of deafness, the court should exercise great care to see to it that the defendant is accorded his constitutional rights. The trial judge, on the scene and observing the defendant and the witnesses, must be allowed considerable discretion, and where it is apparent that the judge has demonstrated an awareness of the issues involved and concern for the protection of the rights of the defendant, as here, his judgment must be accorded great weight and respect by this Court. Greenlee v. State, 437 So.2d 1010 (Miss. 1983); Glenn v. State, 439 So.2d 678, 680 (Miss. 1983); Gammage v. State, 510 So.2d 802, 804 (Miss. 1987). At the close of the State's case in chief, when counsel for Philip renewed a pretrial motion based upon Philip's alleged incapacity, the trial judge said:
I did appoint an interpreter, a qualified oral interpreter, Ms. Marie Griffin, from the University of Tennessee at Knoxville. She is a very eminently qualified oral interpreter accepted by both sides as to her qualifications. She's been present since her appointment at all pretrial proceedings except when defense counsel specifically waived her presence. She has been present since the very beginning of this trial on Monday of this week. She's been at counsel table. She has through various means of communication been communicating the proceedings to the defendant including writing notes which she is doing at this very moment. The defendant through previous testimony and through previous evidence offered at pretrial hearings is a well educated young man, having received a diploma from Strider Academy in Tallahatchie County, having gone to Northwest Mississippi Junior College, and having attended the University of Mississippi. Lay witnesses in pretrial hearings and lay witnesses during this trial have stated clearly and unequivocally that they could communicate with this defendant; that they could communicate to the defendant what they were trying to communicate and that he in turn could communicate to them what he was trying to communicate. The witnesses have testified at pretrial hearings, and they've testified at the trial of this case this week that in essence he could understand when he wanted to and he could make it difficult when he did not want to understand, words to that effect. That came out through the testimony of various lay witnesses, including, as I recall, Joy Wolfe; the victim herself, Cathy Thaggard; the highway patrolman, Roy, I believe, and perhaps other witnesses.
I'm satisfied, again, that this court is making every effort and is, indeed affording to this defendant every constitutional right available to him; that he is receiving a constitutionally fair trial.
The court has permitted throughout the course of these proceedings, including pretrial proceedings, to allow members of the defendant's family to be with *846 counsel and with the defendant at counsel table to assist in communication. The court has since Monday of this week when this trial started allowed Mrs. Betty Shook, the sister of the defendant, Mr. Philip Shook, Sr., the father of the defendant, to be at counsel table with the defendant. They were not removed from the courtroom under the rule even though they might be witnesses in this case. They were allowed to remain in the courtroom to be at counsel table, meaning that at counsel table in addition to Mr. Tollison there were present the defendant; Ms. Marie Griffin, the oral interpreter; Ms. Betty Shook, the defendant's sister; and Mr. Philip Shook, Sr., the defendant's father.
This court is doing everything that it can conceivably think of to make sure that this defendant is receiving a fair trial and is understanding the proceedings going on. I'm satisfied all of this is being done. I'm satisfied he can certainly understand and appreciate the nature of the proceedings.
As I stated earlier in the week, I'm satisfied that if he will cooperate with his family and will cooperate with his oral interpreter and will cooperate with his attorney that the communication channels are open and that this defendant is being afforded all his constitutional rights.
We have considered with great care the arguments presented by counsel for the defendant, and the authorities set out in the briefs. We do not feel disposed to burden the literature with a line by line discussion of the argument. It will suffice to say that the rules which apply to persons who are deaf, illiterate, and mentally retarded do not apply to the deaf who are able to complete high school and do, with moderate success, academic work at the college level. The Lang cases simply have no application here. People v. Lang, 76 Ill.2d 311, 29 Ill.Dec. 87, 391 N.E.2d 350 (1979), 113 Ill.2d 407, 101 Ill.Dec. 597, 498 N.E.2d 1105 (1986). There is no merit in this assignment.

III.
The third assignment contends that the court below erred in refusing to suppress evidence obtained from a deaf person pursuant to consent to search forms obtained without an interpreter present. On September 5, 1985, the appellant was brought to the Lafayette County jailhouse where he signed a form permitting law enforcement officers to search his dormitory room and truck. The appellant argues that the consent to search was invalid because he was not afforded an interpreter in accordance with § 13-1-303(3) Miss. Code Ann. (1972), as amended. He contends that, as a consequence of the alleged invalidity of this search, certain prejudicial evidence should not have been admitted into evidence (blue jeans, foot print, persimmon branches). We shall look first at the constitutional permissibility of the search.
On the morning of September 5, 1985, Officer Jay Clark, an investigator with the Highway Patrol, and Sheriff Shelton Ingram of Tate County, met with Shook at the Lafayette County Jail. Shook was informed that the officers were investigating the shooting of Cathy Thaggard and they advised him of his rights. Shook was handed a waiver of rights form which he appeared to scrutinize. He then signed the form. The officers also gave him a consent to search form, which stated, in part, that Shook had a right not to consent. The officers had previously, in writing, asked Philip for permission to search his dorm room and truck. He had orally agreed. Later Philip read the consent to search form and signed it.
A consent to search must be judged from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Penick v. State, 440 So.2d 547 (Miss. 1983).
It is clear from the record the appellant understood what he was doing when he signed the consent to search form. The testimony was that the appellant was asked by the law enforcement officers for his permission to search his dormitory room and truck. He was told that he did not have to consent to the search. There is *847 nothing in the record to even suggest that the appellant's consent was other than knowingly and voluntarily made. Even without the appellant's consent the law enforcement officers clearly had a right to search the exterior of the appellant's truck where they found the persimmon branches and later took soil samples from the wheel covers. The courts have long recognized generally one does not reasonably expect to keep private that which can be seen by the public. Katz v. U.S., 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). See, also, Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); Deshazier v. State, 155 Ga. App. 526, 271 S.E.2d 664 (1980); and Department of Transportation v. Armacost, 299 Md. 392, 474 A.2d 191 (1984). If there is any question concerning the search of the truck and the soil samples taken therefrom, it is laid to rest by the consent given by both Philip Shook, Sr. and the appellant, both of whom held joint title to the vehicle.
The testimony of the law enforcement officers clearly indicates the appellant understood what he was doing when he agreed to the search. He was asked questions to which he gave appropriate responses. In particular, he was told that he did not have to consent to the search. Therefore, we find the search of the truck and appellant's room was constitutionally valid.
We shall next look at the effect, in this case, of MCA § 13-1-301, et seq. having to do with the requirement that interpreters be appointed for deaf persons in criminal inquiries and proceedings.[1]
*848 The prosecution had possession of statements made by the appellant which it did not introduce because of the belief that the statements were inadmissible since no interpreter had been appointed or was present when they were made. The question of the admissibility of these statements is not before us, and we do not address that issue. A literalistic reading of § 13-1-303(5) suggests error in the admission of the fruits of the search. The consent to search arguably may have been a statement made by a deaf person used against him. What is wrong with this reasoning is that (in addition to oral communications) both the request for and granting of the consent were done in writing. Shook used communicative and cognitive faculties other than hearing, faculties no one suggests were impaired, and with thos faculties he received in writing a request that he consent to the search, advice that he had a right not to consent, upon which he gave a written consent. Because we need not rely on Shook's hearing abilities (or lack thereof) to find a valid and effective consent to search, we hold the violation of § 13-1-303(5), if any, harmless beyond a reasonable doubt.
This entire statute badly needs legislative revision. It is ambiguous and unclear, but, for our purposes here it suffices to say that it simply does not apply, by its terms, and we decline to expand it under the guise of interpretation.
Even if we were found to be in error on this matter and the dormitory search held invalid, the error would be harmless in light of the overwhelming weight of the evidence which fully and amply support the jury's verdict of the appellant's guilt.
This assignment is denied.

IV.
The fourth assignment of error argues that the trial court erred at the conclusion of the case for the state and again upon the acquittal on two of the counts of aggravated assault in refusing to dismiss the count of firing into a dwelling. The appellant was indicted separately for four crimes: aggravated assault on Cathy Thaggard, aggravated assault on Jerry Thaggard and Frances Thaggard, and shooting into a dwelling house. All four of the charges arose from the same incident, Shook's firing a high-powered rifle multiple times into the Thaggard's home. Shook was convicted of aggravated assault on Cathy Thaggard and shooting into a dwelling house, but acquitted on the charges of aggravated assault on Mr. and Mrs. Thaggard. Shook now contends, based upon principles of double jeopardy embodied in both the Fifth Amendment to the Constitution of the United States and Section 22 of the Mississippi Constitution of 1890, the charge of shooting into a dwelling house should have been dismissed. We must determine whether, under these facts, the aggravated assault and the shooting into a dwelling house constitute the "same offense." Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); Illinois v. Vitale, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228, 235 (1980); Brown v. Ohio, 432 U.S. 161, 166, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187, 194 (1977). Under Blockburger, supra, the objective elements of each offense must be examined. The test to be applied is whether each provision requires proof of a fact which the other does not.
We have examined the aggravated assault statute, § 97-3-7(2) M.C.A. (1972) as amended, and the shooting into a dwelling house statute, § 97-37-29, M.C.A. (1972) as amended.[2] Clearly the two statutes require *849 proof of different facts. Had no shots been fired except those which struck Ms. Thaggard, Shook's position on this point would be arguably correct, in that the very same facts which were required to prove the aggravated assault would also prove the crime of shooting into a dwelling house in this particular situation. However, under the statutes, shooting into a dwelling house is not required to establish an aggravated assault, and neither injury nor attempt to injure is required to prove shooting into a dwelling house. It is clear that at least eighteen shots were fired into the house. Not all of them struck Cathy, nor, presumably were intended to, but each one was fired into a dwelling house. The weapon used was not fully automatic. Each shot required that the trigger be pulled again. Based upon the facts as they appear here, however, appellant was properly charged and tried for both offenses. See Pharr v. State, 465 So.2d 294 (Miss. 1984).
This assignment is without merit.

V.
The fifth assignment of error contends that the court below erred on various evidentiary rulings by admitting some evidence offered by the State over the objection of the defendant which was inadmissible and by prohibiting the introduction of certain evidence offered by the defendant.
The appellant has assigned as error six evidentiary rulings of the trial court. We have examined the six alleged errors and find that, in five of the instances, there was no error. A discussion of each of them would merely lengthen this opinion and would not be instructive. One of the six, appears to be well taken. The appellant argues the lower court erred in allowing into evidence statements which were made in his presence and since he is deaf he could not acquiesce to any statements in his presence. The assignment, however, avails appellant nothing because the statement objected to was totally irrelevant and harmless and was not offered to prove the truth of the matters stated and did not constitute hearsay under Miss.Rule of Evidence 801(c). See also Id. 103(a). In overruling this assignment we are not to be understood as holding that genuine hearsay statements made in the presence of an accused who is profoundly deaf are rendered admissible merely because they were made in the presence of the accused. That question is not before us.
This assignment is denied.

VI.
The appellant next argues the trial court erred in refusing to grant a second change of venue when fifty-four out of the one hundred six persons in the venire had either discussed the case, read about it in the newspaper or had other knowledge concerning the case.
The defendant filed a motion to change the venue from Tate County. The state did not oppose the motion and the trial was moved to the Second Judicial District of Panola County. On two different occasions after the venire was impanelled the appellant's counsel moved for a second change of venue, contending that fifty-four out of the one hundred and six members of the venire had knowledge or had formed opinions concerning the case. The motions were denied.
On the issue of the change of venue, this Court has held that we will not disturb the ruling of the lower court where the sound discretion of the trial judge in denying the change of venue was not abused. Harris *850 v. State, 537 So.2d 1325, 1328 (Miss. 1989); Wiley v. State, 484 So.2d 339, 342-43 (Miss. 1986); Cabello v. State, 490 So.2d 852, 854-55 (Miss. 1986); Weeks v. State, 493 So.2d 1280, 1285-87 (Miss. 1986).
Here, we cannot say the trial court abused its discretion. Further, the appellant did not comply with § 99-15-33. M.C.A. (1972) by supplying affidavits to support his second motion for a change of venue. Nor is the percentage of veniremen who have heard of the case, in and of itself, indicative of the need for a change of venue. See Burney v. State, 515 So.2d 1154, 1160-61 (Miss. 1987) (refusal to change venue upheld when forty-four of sixty veniremen either had heard of the case or personally knew victims); Lutes v. State, 517 So.2d 541 (Miss. 1987) (refusal to change venue upheld where seventy-one of seventy-nine veniremen had heard of case).
This assignment is denied.

VII.
In this assignment of error the appellant alleges he was denied due process of law as a collective result of action on the part of the State from the time of his arrest through his trial. The appellant argues, among other things, that he was denied due process of law because defense counsel was unable to effectively cross-examine witnesses at the appellant's preliminary hearing. No authority is cited for this assignment. In fact an extensive hearing was held and the defendant was bound over to await the action of the grand jury. The primary purposes of said preliminary hearing are to permit the defendant to confront his accusers, to determine whether probable cause exists to bind the defendant over to await the action of the grand jury, and to determine whether the defendant is entitled to bail and if so what bail shall be required. It is true that the court did not allow Shook's counsel unlimited cross-examination (See: Lambert v. State, 524 So.2d 576, 581 (Miss. 1988), dissent by Justice Dan M. Lee), but Shook was later indicted by the grand jury and was accorded a full and fair trial. Beard v. State, 369 So.2d 769, 772 (Miss. 1979); Harris v. State, 206 So.2d 829, 830 (Miss. 1968); Herring v. State, 522 So.2d 745, 751 (Miss. 1988). This portion of his assignment is denied.
The appellant next argues he was denied due process by various discovery violations by the State. The appellant argues that immediately after his indictment, his attorney sought discovery. Some fourteen months later, after the original discovery was made, the State received information that an FBI test on Philip Shook, Jr.'s hands for traces of gun powder was negative. In January, 1987, the State disclosed at a hearing on a motion to suppress that the State of Mississippi had statements made by Philip Shook, Jr. which had not been produced. The State further disclosed it had prepared an investigative file prior to the indictment that it had not disclosed to Philip Shook, Jr. In addition, the appellant argues, the district attorney failed to provide the defendant its list of witnesses on the insanity defense in a timely fashion.
Discovery, to be sufficient, must be made at a time far in advance of trial to give the defense a "meaningful opportunity" to make use of it. See Turner v. State, 501 So.2d 350, 352 (Miss. 1987).
In matters such as the one presently before us we have held:
Where the state is tardy in furnishing discovery which it was obligated to disclose, the defendant is entitled upon request to a continuance postponement of the proceedings reasonable under the circumstances. Henry v. State, 484 So.2d 1012, 1014 (Miss. 1986); McKinney v. State, 482 So.2d 1129, 1131 (Miss. 1986); Cabello v. State, 471 So.2d 332, 343 (Miss. 1985); Box v. State, 437 So.2d 19, 26 (Miss. 1983) (Robertson, J., concurring).
See also, Shaw v. State, 521 So.2d 1278, 1282 (Miss. 1987); Stewart v. State, 512 So.2d 889 (Miss. 1987); Box v. State, 437 So.2d 19 (Miss. 1983).
Here, the defense counsel could have moved for a continuance but did not. This part of the assignment is also denied.
*851 The appellant next argues that comments of the State in voir dire, and during its opening and closing statements at trial were so inflammatory as to deny him due process of law. In the district attorney's opening statement, he stated:
It is as tight a circumstantial evidence case as I believe has ever been developed in a court of law, and I say that without reservation, and I think you will agree with me at the conclusion of all this proof because the proof will show ..."
At this point, defense counsel objected and the trial court sustained his objection and instructed the jury to disregard the district attorney's comment. Also in the opening statement the district attorney stated, "We'll show you that high-powered rifle that shot this poor, helpless girl in the safety of her own home in the comfort of her own bed." Defense counsel immediately objected to the comment as argumentative and the trial court overruled. Finally, in his closing statement, the district attorney stated:
At this point in the trial neither you nor I know if the defendant contends he's not guilty because he didn't shoot the gun into that house or if the defendant claims he's not guilty because he did shoot the gun into the house and he could not appreciate the wrongfulness of that act when he fired the gun.
Defense counsel objected arguing that the comment was an indirect comment on the failure of the appellant to take the stand. The trial court overruled the objection and instructed the jury that comments of the attorneys were not evidence. The jury is presumed to follow such instructions. See Shelby v. State, 402 So.2d 338, 340 (Miss. 1981); Cabello v. State, 490 So.2d 852, 857 (Miss. 1986). We have examined the appellant's arguments and find that they have no merit.
The case of Jimpson v. State, 532 So.2d 985, 991 (Miss. 1988), clearly supports the Court's decision of finding no merit. In Jimpson, the Court held that the prosecutor's statement during closing argument that "they" had not bothered to tell the jury why defendant was at a certain location did not constitute an improper comment on the defendant's failure to testify during trial. Jimpson, 532 So.2d at 991. As recognized in Jimpson, not every comment regarding the lack of any defense or upon the defense presented is equivalent to a comment on the defendant's failure to testify. Id. Attorneys are to be given wide latitude in making their closing arguments. Id. (citing Johnson v. State, 477 So.2d 196, 209 (Miss. 1985)). Moreover, the State is entitled to comment on the lack of any defense, and such comment will not be construed as a reference to a defendant's failure to testify "by innuendo and insinuation." Id. (citing Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983)). The comments in the case at bar are comments on the defense presented, or lack thereof, and not comments on the failure to testify. Therefore, this part of the appellant's assignment is denied.

VIII.
In the appellant's final assignment of error he claims the sentence requiring him to pay restitution to the insurance company which repaired the victim's home was without due process of law. The appellant has cited no authority to support this proposition. During the sentencing phase of the trial the appellant did not object to the restitution portion of the sentence.
Section 99-37-3(3), MCA (1972), as amended, states:
If the defendant objects to the imposition, amount or distribution of the restitution the court shall, at the time of sentencing, allow him to be heard on such issue.
The appellant did not ask to be heard on the issue of restitution and we find he should not now be heard to complain. Watts v. State, 492 So.2d 1281, 1290-91 (Miss. 1986); Cummings v. State, 465 So.2d 993, 995 (Miss. 1985); Ponder v. State, 335 So.2d 885, 886 (Miss. 1976).
In summary, we find that the appellant was treated with the utmost fairness in this case and that the judgment of the trial court should be, and it is hereby, affirmed.
AFFIRMED.
*852 ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON and ANDERSON, JJ., concur.
DAN M. LEE, P.J. and SULLIVAN, J., dissent.
PITTMAN, J., not participating.
DAN M. LEE, Presiding Justice, dissenting:
The majority is of the opinion that the district attorney's indirect comment on the failure of Philip Shook to testify was cured by the judge's instruction to the jury. A review of the long-standing case law on this subject reveals that the majority completely ignores our staunch position that "district attorneys must not directly, or by innuendo and insinuation, comment on a defendant's not testifying." See Wilson v. State, 433 So.2d 1142 (Miss. 1983).
As noted in the majority opinion, during closing argument the district attorney made this statement:
At this point in the trial neither you nor I know if the defendant contends he's not guilty because he didn't shoot the gun into that house or if the defendant claims he's not guilty but he did shoot the gun into the house and he could not appreciate the wrongfulness of that act when he fired the gun.

(Emphasis added). Defense counsel, objecting to this comment, argued:
Excuse, me, Your Honor. I object to the comment of Mr. Kelly. It's an indirect comment on the failure of Mr. Shook to take the stand. It's improper, and I move for a mistrial. I object.
The trial judge overruled the objection and instructed the jury "that the comments of the attorneys are not evidence."
Citing Shelby v. State, 402 So.2d 338 (1981), the majority attempts to uphold the trial court's position by pointing out that "the jury is presumed to follow such instructions." Yet, the majority ignores the fact that the judge's remarks in Shelby were to admonish an attorney for making reference to an instruction as "the defendant's instruction." The Court's reasoning in Shelby, as well as Cabello v. State, 490 So.2d 852, 857 (Miss. 1986), fails to address the issue at hand.
In my opinion, the majority completely side-steps the constitutional issue. Under the Fifth Amendment of the United States Constitution, as well as Art. III § 26 of the Mississippi Constitution, a person "shall not be compelled to give evidence against himself... ." When this right has been threatened in the past by over zealous prosecutors, we have not hesitated to protect the rights of the defendant.
Recently, in Jimpson v. State, 532 So.2d 985 (Miss. 1985), we noted that:
As noted earlier, this Court has recognized that a direct comment on a defendant's failure to testify is not allowed and constitutes reversible error. Livingston v. State, 525 So.2d 1300, 1305-08 (Miss. 1988), Bridgeforth v. State, 498 So.2d 796, 797-8 (Miss. 1986). Prosecutors are also forbidden from referring to a defendant's failure to testify "by innuendo and insinuation." Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983).
Id. at 991.
The rationale set out in Jimpson, supra, is linked to our holding in Livingston v. State, 525 So.2d 1300 (Miss. 1988), where we recognized the appellant's fundamental right to challenge improper comments on the part of the prosecutor. This Court in Livingston, citing West v. State, 485 So.2d 681 (Miss. 1985), Monroe v. State, 515 So.2d 860 (Miss. 1987), and Griffin v. State, 504 So.2d 186 (Miss. 1987) said:
As we stated in West, comments on the defendant's failure to testify violate an "elementary and long established principle of law." In West, Griffin and Monroe, we recognized that the principle involves a constitutional right.

(Emphasis added). Id. at 1307.
Looking at the prosecutor's comment on failure to testify from a constitutional standpoint, we said:
However, the error complained of here is incurable See Peterson v. State, 357 So.2d 113, 115 (Miss. 1978) (holding that trial judge's admonition of the jury to disregard prosecutor's comments on the defendant's failure to testify did not cure the error). See also Sanders v. State, 73 *853 Miss. 444, 18 So. 541 (1895); Reddick v. State, 72 Miss. 1008, 16 So. 490 (1895). Our cases on point clearly indicate that once such improper comments are made the defendant is entitled to a mistrial. The error is incurable. Stated another way, the prosecutor's remarks put this case in error. Nothing the trial judge or defense counsel could have done would have saved this trial.
Id. at 1307.
In the case at bar the district attorney clearly made the "insinuation" that Philip Shook failed to testify. As in Livingston, the prosecutor's comments "put this case in error." Thus, it follows that "nothing the trial court ... could have done would have saved this trial." Livingston at 1307.
For the foregoing reasons, I decline to join the majority opinion. Instead, I would uphold what we said in Livingston:
Those who would enforce our laws should abide by our laws. Section 13-1-9 is one of our laws (as are our State and Federal Constitutions). We are sworn to uphold our laws and we take seriously the state's violation of them.
Id. at 1308.
Accordingly, I would reverse and remand for a new trial.
SULLIVAN, J., joins this dissent.
PITTMAN, J., not participating.
NOTES
[1] § 13-1-301. Definitions.

As used in sections 13-1-3 et seq. the following terms shall have the definition ascribed to them herein unless the context requires otherwise: (a) "Deaf Person" means any person whose hearing is totally impaired or whose hearing is so seriously impaired as to prohibit the person from understanding oral communications when spoken to in a normal conversational tone. The term further includes, but is not limited to, a person who is mute and a person who is both deaf and mute.
(b) "Qualified interpreter" means an interpreter certified by the national registry of interpreters for the deaf, Mississippi Registry of Interpreters for the Deaf or, in the event a qualified interpreter so certified is not available, an interpreter whose qualifications are otherwise determined. Efforts to obtain the services of a qualified interpreter qualified with a legal skills certificate or a comprehensive skills certificate will be made prior to accepting services of an interpreter with lesser certification. No qualified interpreter may be appointed unless the appointing authority and the deaf person make a preliminary determination that the interpreter is able to interpret accurately the statements of the deaf person and interpret the proceedings in which a deaf person may be involved.
(c) "Oral interpreter" means a person who interprets language through facial and lip movements only and who does not use manual communication. An oral interpreter shall be provided upon the request of a deaf person who does not communicate in sign language. The right of a deaf person to have an interpreter may not be waived except by a deaf person who does not use sign language and who initiates such request for waiver in writing. Such waiver is subject to approval of counsel of such deaf person, if existent, and is subject to approval of the appointing authority.
§ 13-1-303. Appointment of interpreter; court proceedings; policy custody; statements of deaf person as evidence.
(1) In any case in law or equity before any court or the grand jury, wherein any deaf person is a party to such action, either as a defendant or witness, the court shall appoint a qualified interpreter of the deaf sign language to interpret the proceedings to the deaf person and interpret his testimony or statements and to assist in preparation with counsel.
(2) Whenever any deaf person is a party in interest, either as a defendant or witness at a proceeding before any department, board, commission, state, the department, board, commissioner, agency or licensing authority conducting the proceedings shall appoint a qualified interpreter of the deaf sign language to interpret the proceedings to the deaf person and to interpret any testimony he may give.
(3) In the event that a deaf person has been detained in police custody or has been arrested for any alleged violation of a criminal law, a qualified interpreter or, upon request, an oral interpreter shall be provided by the arresting officer and his superiors prior to any interrogation or taking of a statement from the person.
(4) In the event an interrogation statements in writing are made to the arresting officer by the deaf person with the qualified interpreter present, such interrogation and answers thereto shall be preserved and turned over to the court in the event such person is tried for the alleged offense.
(5) Any statement made by a deaf person to a law enforcement officer may be used as evidence against that person only if the statement was made, offered or elicited in the presence of a qualified interpreter of the deaf sign language. No statements taken from such deaf person prior to the presence of a qualified interpreter may be admissible in court.
[2] § 97-3-7. Simple assault; aggravated assault.

... .
(2) A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the penitentiary for not more than twenty (20) years. Provided, however, a person convicted of aggravated assault upon a law enforcement officer or fireman while such law enforcement officer or fireman is acting within the scope of his duty and office shall be punished by a fine of not more than five thousand dollars ($5,000.00) or by imprisonment for not more than thirty (30) years, or both.
§ 97-37-29. Shooting into dwelling house.
If any person shall willfully and unlawfully shoot or discharge any pistol, shotgun, rifle or firearm of any nature or description into any dwelling house or any other building usually occupied by persons, whether actually occupied or not, he shall be guilty of a felony whether or not anybody be injured thereby and, on conviction thereof, shall be punished by imprisonment in the state penitentiary for a term not to exceed ten (10) years, or by imprisonment in the county jail for not more than one (1) year, or by fine of not more than five thousand dollars ($5,000.00), or by both such imprisonment and fine, within the discretion of the court.