**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 00-60436**

_____

**PHILLIP SHOOK, JR.,**

**Petitioner-Appellant,**

**versus**

**STATE OF MISSISSIPPI; ROBERT L. JOHNSON,**
**COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS,**

**Respondents-Appellees.**

_____

**Appeal from the United States District Court**
**for the Northern District of Mississippi**
**(2:93-CV-118-D-B)**

_____

November 26, 2001

Before KING, Chief Judge, BARKSDALE, Circuit Judge, and SCHELL, District Judge[1]:

PER CURIAM:[2]

For this challenge to the denial of habeas relief, at issue are: whether the record fairly supports the state trial court's finding that Phillip Shook, Jr., who was/is profoundly deaf, was competent to stand trial; and whether the district court's identical competency finding, following two federal evidentiary hearings, is clearly erroneous. Shook contends he was deprived of

_____

[1]United States District Judge of the Eastern District of Texas, sitting by designation.

[2]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

due process and his ability to communicate with counsel because of his hearing impairment and the state trial court's refusal to continue the trial until he learned sign language. **AFFIRMED**.

## I.

The state trial court, based on several hearings, ruled Shook's hearing impairment did not render him incompetent to be tried. A jury convicted Shook in 1987 for aggravated assault and firing a gun into an occupied dwelling; he was sentenced to 30 years imprisonment. *Shook v. State of Mississippi*, 552 So. 2d 841, 843 (Miss. 1989). The Mississippi Supreme Court affirmed. *Id.* During the habeas proceeding in district court, Shook had two more competency hearings; one each before the magistrate judge and district judge. Because, as discussed *infra*, the competency issue at hand is a finding of fact, and in the light of the numerous hearings on the issue, we must go into considerable detail in describing the record.

## A.

Shook has been profoundly deaf since birth. He did not know sign language at time of trial. Instead, he had been trained in lipreading, also known as speech-reading.

Shook began wearing a hearing aid when he was a year old. He attended the Memphis Oral School for the Deaf for one year. That school utilized the "oral" method of communication, involving speech-reading rather than sign language. When he was in the

2

second grade, Shook's parents enrolled him in Strider Academy, a private school in his hometown of Charleston, Mississippi, where he was educated with hearing children. Although he failed some classes at Strider, he did not have to repeat any grades and received a diploma. While at Strider, he played football.

Following graduation from high school, Shook attended Northwest Mississippi Junior College (NMJC) for one semester (fall 1984), where he was on the football team. While at NMJC, he began dating Cathy Thaggard; they became engaged to be married. Shook transferred to the University of Mississippi for the 1985 spring semester. Shook and Thaggard broke off their engagement that June.

In the early morning hours of 5 September 1985, 18 rounds from a high-powered rifle were fired through the window of Thaggard's bedroom in her parents' home, where she was sleeping. *Shook*, 552 So. 2d at 842-43. She was severely wounded; her left arm and leg had to be amputated. *Id*. at 843.

Shook was questioned about the incident and consented to the search of his dormitory room at the University and of his vehicle. *Id*. at 843-44. He was arrested a week after the incident and charged with aggravated assault and firing into an occupied dwelling. Following his indictment that October, he remained free on bail pending trial.

B.

In December 1985, Shook filed several pretrial motions based on his hearing impairment. He sought: appointment of an oral interpreter; a stay of the proceedings until a system could be developed to communicate with him; and simultaneous stenographic transcription of all proceedings (in addition to an oral interpreter). At the hearing on those motions on 30 January and 7 February 1986, six witnesses testified on behalf of Shook.

University of Mississippi speech/language pathologist Dr. Kellum testified: Shook could not hear speech; testing performed when Shook enrolled at the University of Mississippi in 1985 revealed multiple articulation errors and significant difficulties in language comprehension and use of verbal language; Shook frequently answered questions inappropriately, which indicated he did not speech-read successfully; Shook had very poor communicative skills, and his chance for improvement was minimal, even with language and speech therapy; Shook's estimated ability to use language was equivalent to that of an 11 or 12-year-old; individuals who are taught to speech-read generally can understand about one-third of what is being said; and a registered oral interpreter for the deaf would best be able to communicate with Shook.

Speech pathologist Gore testified: she evaluated Shook in 1981 and worked with him through December 1982; testing in 1981,

4

when Shook was 16 years old, revealed his overall linguistic functional equivalent age was 10½ years, and his age-equivalent score on a vocabulary test was 6½ years; Shook's lipreading skills were very poor; she worked with Shook on language functioning for about one year, teaching him to use visual cues, but he stopped attending sessions with her due to his involvement in other activities; at the time of his discharge, Shook was able to speech-read two-to-three-word phrases with repetition, but was unable to understand longer phrases; she believed Shook would respond "yes" and "no" without understanding what was being said to him; it was difficult for Shook to grasp abstract concepts, such as constitutional rights, while it was much easier for him to grasp concrete ideas; it would be difficult for Shook to follow conversation among various individuals in a courtroom; over time, Shook could be assisted to understand such conversation through use of a simple writing procedure and explanation; and a teacher of the hearing-impaired or a speech pathologist who worked with the hearing-impaired would be appropriate to assist Shook.

Dr. Willingham, a special education counselor and clinician who taught Shook in 1969 and 1970, testified: abstract concepts are very difficult to teach to the hearing-impaired; Shook would attempt to appear normal in group situations, although he might not understand what others were saying; he could understand to some degree what another person was saying during a one-on-one interaction; she believed an oral interpreter could help Shook over

5

time; and she spoke with Shook shortly before the hearing and estimated that his language level was about where it had been in 1970, approximately 16 years earlier.

Shook's mother testified: she and her husband used a telephone amplifier to translate telephone conversation to Shook; Shook called people on the telephone to convey information, but he did not know whether the person called understood what he had said and could not hear what that person said to him; he would dial a number and begin speaking, not knowing whether the person called had answered; Shook drove vehicles, hunted, went to movies, and watched television; he had a tape player in his room, but she did not know if he ever played it; she would have to go upstairs to get Shook because he could not hear her call from downstairs; she had to use repetition when communicating with Shook; she sometimes communicated with Shook in writing but had to write in simple sentences, using simple language; people who were around Shook long enough learned how to communicate with him; she and other family members helped Shook with written school assignments; Shook had no interpreters while attending high school and NMJC; Shook and Thaggard were able to communicate; and Shook did poorly with adjectives and adverbs, best with nouns and pronouns, and knew nothing about tenses.

Shook's father testified: he was able to communicate with Shook; Shook is unable to hear words but can hear close, low-pitched sounds; when Shook was upstairs and the father wanted him

6

to come downstairs, the father switched on a light as a signal; Shook did not speak in complete sentences and was unable to write complete sentences without assistance; Shook's sister helped draft letters from Shook to Thaggard; he and Shook's sister did Shook's schoolwork while Shook was in high school and at NMJC; when Shook played football, he memorized plays and reacted to hand signals; when the father spoke with Shook after Shook was arrested, and asked whether he understood his rights, Shook responded that he had a right to attend school and football games; Shook would not understand that he had a right to an attorney and had difficulty understanding discussions with defense counsel; he and other family members would go over the discussions in writing with Shook after his meetings with counsel; and, although Shook could read, Shook did not understand what he read.

Shook took the witness stand, but failed to respond to many of counsel's questions and gave unintelligible answers to others; he either did not understand or did not respond to counsel's questions about his arrest, his constitutional rights, and the search of his room at the University.

Defense counsel did not testify, but stated: he had made repeated, unsuccessful attempts to communicate to Shook the nature of the proceedings and the basic concepts of his situation; he did not believe Shook understood the charges against him; and he was not sure an oral interpreter would be of much assistance.

The State called nine witnesses. Pierce, who worked in the NMJC business office, testified: Shook visited her office on numerous occasions, the first of which involved his request for her assistance with a parking ticket he had received; Shook did not have difficulty communicating his wishes to her, and also asked her questions about her family and personal life; and she usually understood what Shook was trying to say to her but sometimes asked him to repeat himself.

Franklin, head football coach at NMJC, testified: he had some difficulty understanding Shook but was able to communicate with him, with the occasional assistance of Shook's teammates; and he never felt Shook did not understand him.

Fennell, Shook's high school typing teacher, testified: she faced Shook when giving directions to the class but otherwise made no accommodations for him; and Shook followed directions, was able to communicate with her and would let her know if he did not understand her.

Bradshaw, headmaster and football coach at Strider, testified: he was able to communicate with Shook with some extra effort; Shook was able to understand and follow directions that were made clear to him; Shook was able to understand and complete written tests given in class; he had seen Shook dancing at school functions and had observed Shook speak on the telephone; and, on occasion, he thought Shook took advantage of a claimed lack of understanding.

8

Spence, who also coached and taught Shook at Strider, testified: he was able to communicate with Shook, although he had to repeat instructions and sometimes had difficulty understanding Shook's speech; Shook had to obtain notes from other students in classes, because he was unable to take all of the notes himself; and Shook was able to follow directions for tests administered in class, without extra help or explanation.

Wolfe, Thaggard's close friend and roommate at NMJC, testified: Shook was able to communicate well with her, Thaggard, and others; she observed Shook taking notes in a history class, and they often got notes from each other for that class; Shook would not begin to speak on the telephone with her or Thaggard until one of them answered the telephone, and he could distinguish between their voices on the telephone; Shook became upset whenever she or Thaggard attempted to write notes to him or otherwise made obvious attempts to accommodate his hearing impairment; and she had observed Shook turn from the front seat of an automobile when his name was called from the back seat.

Fillyaw, who had also dated Shook, testified: she had to face Shook when speaking to him and repeat herself; and Shook called her on the telephone and she was able to understand him, and he seemed to understand her on some occasions, but not others.

Thaggard's mother testified: Shook had been in her home 75-100 times; Shook generally gave appropriate responses in communicating with her and would let her know if he did not

9

understand something; when she and her husband visited Shook's home, she observed Shook respond when Shook's father, who was downstairs, called Shook, who was upstairs; she had spoken with Shook on the telephone, was able to understand him, and he appeared to have understood her; Shook was able to communicate with family members; and Shook sometimes answered her without her facing him.

Consistent with his wife's testimony, Thaggard's father testified about his observations of Shook's communicative abilities.

Shook called seven witnesses in rebuttal. Hearing-aid dispenser Fortner, who had known Shook since 1970, when Shook was five years old, testified: Shook tries to conceal his hearing-impairment; the main benefit Shook received from a hearing aid was knowledge of the presence of a sound or voice; Shook scored 40 percent on a word test when combining hearing aids with speech-reading and watching facial expressions; and he had been unable to make Shook recognize his voice on the telephone.

Audiologist Bagwell testified: objective audiological tests conducted the day before the hearing indicated Shook had profound hearing loss; without a hearing aid, Shook would not be able to hear normal conversation; and she doubted Shook could hear normal conversation with a hearing aid.

University of Mississippi audiologist Brooks testified: Shook might be able to distinguish voices and hear vowel sounds, which are carried by lower frequencies; although consonant information is

10

carried by higher frequencies, where Shook suffered the most damage, consonant information is more visible on the lips than vowel information; Shook was not a successful example of an oral deaf person because of the unintelligibility of his speech and his very low language level; Shook could not function using speech and hearing in a way that would meet his needs; she did not believe a speech-reading course would improve Shook's abilities; Shook lacked the language to understand abstract concepts such as constitutional rights, alibis, plea bargaining, and pleading guilty or not guilty, and would have difficulty communicating with his attorney; she doubted that appointment of an oral interpreter would be of much assistance to Shook, because such interpreters are most effective for hearing-impaired persons who have good language, reading, and writing skills, and the interpreter would not be able to make up for Shook's years of inability to understand the world around him because of his hearing impairment, but appointment of an oral interpreter would be better than doing nothing, because the interpreter might be able to break down questions about specific events in a way that Shook might understand; and she believed Shook knew he was in trouble, understood he might go to jail, and understood that some of the people in the courtroom wanted to put him in jail, while others wanted to keep him out of jail.

Three members of the Charleston community, testified about the difficulties they had experienced communicating with Shook.

Shook's sister testified: she wrote papers for him while he was in high school, and she and her father assisted Shook with his other schoolwork; Shook could use a telephone only with assistance and could hear pitches, tones, and sounds; she had attempted to explain some of the proceedings to Shook but had been unable to communicate to him the concepts of courts and the American justice system.

At the conclusion of the hearing, Shook's counsel requested that Shook be examined by a clinical psychologist at the Mississippi School for the Deaf, because independent psychiatric counseling had been unsuccessful.

Later, in February 1986, the state trial court granted Shook's motion for appointment of an oral interpreter. That March, the trial court conducted a conference with Shook, his counsel, counsel for the State, and Griffin, a certified oral interpreter who specialized in legal interpretation, in order to make a preliminary determination, pursuant to Mississippi law, whether Griffin was able to interpret accurately Shook's statements and the proceedings in which Shook would be involved. After Shook and his counsel met privately with Griffin, Shook's counsel stated he was satisfied Griffin was qualified and should be appointed. In its order appointing Griffin, the state trial court made a preliminary determination, concurred in by Shook and his counsel, that Griffin

12

was able to interpret accurately the statements of Shook and the proceedings in which he might be involved.

The day after the conference with Griffin, however, Shook filed a motion asserting he was incompetent to stand trial and requesting a psychological and educational evaluation by a psychologist with expertise in evaluating deaf persons. That May, he moved for a continuance until he could learn sign language. That September, the trial court conducted a hearing on those two motions. Shook called two witnesses; the State, none.

Dr. Vernon, a psychologist who specialized in deafness, testified: he met with Shook for three to five hours, met with members of Shook's family, and reviewed reports of tests performed on Shook; Shook cannot hear speech well enough to understand it, with or without hearing aids; he was unable to evaluate Shook psychologically because of Shook's inability to communicate; Shook needed a thorough psychological evaluation, but it could not be performed until Shook learned sign language; even with an excellent interpreter, such as Griffin, Shook would probably understand, at best, five percent of what was going on; a deaf person who does not understand sign language would only understand two to three percent of what was going on at trial; deaf persons habitually smile and indicate they understand what is being said to them, rather than admitting otherwise; Shook could not assist counsel in the preparation of his defense; the method of educating Shook had been wrong and had caused irreversible damage; the only way Shook could

13

acquire a reasonable understanding of the proceedings would be for him to learn sign language; if Shook were totally immersed in a deaf community, such as Gallaudet College in Washington, D.C., he was 95 percent certain Shook would learn sign language proficiently to stand trial in one year, but he did not know whether Shook would be admitted to Gallaudet; Shook understood he was charged with a crime and had a "very vague" concept of the nature and consequences of the charges, but he did not understand the concept of punishment if convicted; the indictment was written at a language level well beyond Shook's capability; Shook's IQ was 106 or 108, slightly higher than average; he saw no evidence of mental illness in the tests he performed on Shook; he did not believe Shook could testify at trial, even with the oral interpreter's assistance; and he believed Shook could differentiate right from wrong but believed Shook could not understand abstract legal concepts.  In response to questioning by the trial court, Dr. Vernon conceded that, even if Shook were taught sign language, he could not promise Shook would be able to assist counsel and understand the proceedings.

The court-appointed oral interpreter, Griffin, testified: sign language communication with a deaf individual is much quicker than oral communication; she did not know if Shook would comprehend more of the proceedings and communicate better if he signed; she did not believe Shook understood everything that she was interpreting for him, even when he indicated he did; Shook frequently responded to her inappropriately, indicating a lack of

14

understanding; and Shook occasionally wanted to comment to her and his attorney about testimony, but his attorney had made it clear he did not want to be interrupted during the proceedings.

Shook's counsel submitted an affidavit in support of the motions, stating: it was impossible for him to determine the nature and extent of what Shook was capable of understanding or whether Shook was mentally capable of assisting in his defense; therefore, a psychological evaluation was essential to evaluate Shook's competence to stand trial.

At the conclusion of that hearing, the trial court granted the motion to the extent of ordering Shook to submit to a psychological evaluation at the Mississippi State Hospital to determine both his competency to stand trial and his criminal responsibility (sanity at time of offense). The court stated Griffin, the interpreter, was to be present during Shook's evaluation.

The subsequent written order, however, did not include the directive about Griffin; she did not accompany Shook. Shook was admitted to the Mississippi State Hospital on 8 October 1986, and discharged approximately a month later.

By letter dated 10 November 1986, Mississippi State Hospital psychologist Dr. Robertson and neurologist Dr. Lancaster reported to the trial court the unanimous opinion of the hospital staff: Shook understood his legal situation; could cooperate with his attorney; and was competent to stand trial. The letter explained: Shook initially answered questions regarding why he was in jail and

15

what kind of trouble he was in, and he had no impairment in recognizing the victim's name and answering other questions; in later interviews, Shook acted as if he did not understand anything, responding, "I don't know", or "I don't understand", regardless of the question asked, except for his age, and refused to write any answers to questions, stating he could not read, write, or speech-read; during his hospitalization, Shook socialized well with other patients, played cards and basketball, served as a basketball referee, read newspapers and magazines, and watched television; and the hospital staff indicated Shook could understand and communicate as long as staff members spoke slowly. Drs. Robertson and Lancaster diagnosed Shook as malingering regarding his presented problems of an inability to read, write, or understand anything said. They concluded that, because Shook's main communicative problem was that he needed a speaker to speak slowly enough for him to speech-read, the only requirement for trial would be that it proceed sufficiently slowly to allow Shook to speech-read.

On 18 November, approximately a week after the date of the report, the trial court denied Shook's continuance and incompetency motions.

On 5 January 1987, Shook moved to exclude the Mississippi State Hospital report and for the court to reconsider delaying trial until he could learn sign language. At a hearing that day, the court denied that motion, as well as Shook's motion that he not be tried until an adequate communication system could be developed.

16

Shook's counsel withdrew his motion for simultaneous transcription and instead requested daily transcription.

Jury selection commenced two weeks later, on 19 January. During voir dire, Shook renewed his motion for a stay until he could learn sign language. The following morning, at a conference in the judge's chambers, Shook's counsel again moved for a continuance on that basis. At that conference, Griffin, the oral interpreter, testified regarding problems communicating with Shook.

At the conclusion of that conference, the court denied the motion. The court quoted extensively from the Mississippi State Hospital report, and stated:

> I had the opportunity yesterday to observe [Shook] in open court at counsel table along with his attorney and with the oral interpreter, Ms. Griffin.... I even permitted [Shook]'s father ... and ... sister ... to be at counsel table. But I observed at least on a couple of occasions [Shook] simply looking away from Ms. Griffin. There's got to be cooperation on the part of everyone including [Shook].
>
> ....
>
> So I recognize the problems indicated by [Shook's counsel] in communicating. Through my months now of observation, I think some of the problems are [Shook]'s unwillingness to cooperate.
>
> I've done everything I feel like within my power and authority to assure [Shook] ... a constitutionally fair trial. Taking into consideration his hearing impairment, I appointed an oral interpreter at [Shook]'s request. She's here assisting. And I think and truly believe that she can be of valuable

17

assistance to this Court and especially to [Shook] if [Shook] will let her.

Certainly, from the standpoint of understanding legal terminology, it's been the experience of this Court that well-educated people who have no hearing impairment or any problems at all come into court without an understanding of the proceedings or how court is conducted and have problems. So I don't think it's anything unusual about having problems with legal terminology.

... I was satisfied and I am still satisfied it would be of no benefit to delay the trial for a year or longer to attempt to teach [Shook] to sign, and even not knowing then what the situation would be.

Again, I feel strongly that [Shook] is being afforded a constitutionally fair trial.

Throughout trial, Shook's father and sister were allowed to remain at counsel table with Shook, his interpreter, and his attorney. Several of the witnesses called by the State testified consistently with their pretrial testimony regarding Shook's communicative abilities. In addition, the victim testified that communication with Shook was difficult when he wanted it to be. At one point, during the testimony of a witness, defense counsel asked for a pause so that the interpreter could explain the testimony to Shook; the trial court allowed it upon being advised by the interpreter that she needed some time. The transcript reflects no other requests by Shook's counsel or the interpreter for breaks in the testimony to facilitate communication with Shook.

18

At the close of the State's case in chief, Shook renewed his previous motions based on his hearing impairment. The trial court denied them, stating:

> Lay witnesses in pretrial hearings and ... during ... trial have stated clearly and unequivocally that they could communicate with [Shook]; that they could communicate to [Shook] what they were trying to communicate and that he in turn could communicate to them what he was trying to communicate. The witnesses have testified ... that in essence he could understand when he wanted to and he could make it difficult when he did not want to understand....
>
> I'm satisfied, again, that this court is making every effort and is, indeed affording to [Shook] every constitutional right available to him; that he is receiving a constitutionally fair trial.
>
> The court has permitted ... members of [Shook]'s family to be with counsel and ... [Shook] at counsel table to assist in communication....
>
> This court is doing everything that it can conceivably think of to make sure that [Shook] is receiving a fair trial and is understanding the proceedings.... I'm satisfied all of this is being done. I'm satisfied he can certainly understand and appreciate the nature of the proceedings.
>
> ... I'm satisfied that if he will cooperate with his family[,] ... oral interpreter[,] and ... his attorney that the communication channels are open and that [Shook] is being afforded all his constitutional rights.

Shook presented the testimony of several witnesses who testified consistently with their testimony in pretrial hearings regarding his hearing impairment and communicative problems. Dr.

19

Vernon's testimony included his opinion, tendered at the pretrial hearing, that Shook was incompetent to stand trial and would remain so until he was taught sign language, and he added: the Mississippi State Hospital malingering diagnosis was not accurate; and anyone who would assume responsibility for psychologically evaluating a person with whom they could not communicate and who had a problem with which they had no experience would be guilty of the "grossest malpractice". Shook also called Dr. Haws, a licensed psychologist, who testified: it would be impossible for her to examine Shook because she could not communicate with him; and she would question the ethical standards of any psychologist or psychiatrist who attempted to examine him, given the degree of his hearing impairment and lack of verbal skills.

In rebuttal, the State called witnesses who testified consistently with their pretrial testimony regarding Shook's communicative abilities, as well as another of Shook's high school teachers, who testified she was able to communicate with Shook and that he was able to read, write, and take written tests in class. In addition, the State called as witnesses Drs. Lancaster and Robertson, who had conducted the court-ordered competency evaluation of Shook at the Mississippi State Hospital. They testified consistently with their report to the court regarding Shook's competency and sanity at the time of the offense, including details about Shook's evaluation; and each also testified Shook was competent to stand trial and knew the difference between right and

20

wrong at the time of the offense. In explaining the malingering diagnosis, Dr. Lancaster testified Shook was exaggerating his *communication problem*, not his speaking or hearing problems.

Post-verdict, Shook moved for a new trial, asserting, *inter alia*: he was denied due process because of his hearing impairment; and the trial court erred by allowing the experts from the Mississippi State Hospital to testify, because they had no expertise in evaluating hearing-impaired persons and did not have an interpreter present when they evaluated him. The motion was denied.

C.

On direct appeal, the Mississippi Supreme Court rejected Shook's claim that the trial court should have delayed the trial until he could be taught sign language, stating:

> The [trial] court had no way of ascertaining whether [Shook] would learn [sign] language nor the degree to which it could improve his real ability to understand and communicate. [Shook] could read, and the record shows that the interpreter kept him well informed as the trial progressed. We can appreciate that it was not easy for counsel to discuss the defense with him, but, clearly it could be done. A trial should not be postponed indefinitely if any reasonable alternative exists. Additional time before the trial and breaks during the trial should be allowed, if good cause is shown, to permit counsel and the defendant to effectively communicate. *No complaint on that score was made here*. This record shows, beyond doubt, that the trial judge reasonably concluded that [Shook] could communicate with those around him sufficiently to permit him to function in a reasonably

21

> normal fashion. He was not illiterate nor
> blind. He is a high school graduate and was a
> college student. During the trial he was kept
> advised of what was being argued and what the
> testimony was.

*Shook*, 552 So. 2d at 844-45 (emphasis added).

The court also rejected, as "totally refuted by the facts", Shook's related claim he was physically, and perhaps mentally, incompetent to stand trial. *Id*. at 845. After quoting at length from the trial court's findings, the State Supreme Court stated:

> The trial judge, on the scene and observing
> the defendant and the witnesses, must be
> allowed considerable discretion, and where it
> is apparent that the judge has demonstrated an
> awareness of the issues involved and concern
> for the protection of the rights of the
> defendant, as here, his judgment must be
> accorded great weight and respect....

*Id*.

D.

Shook, *pro se*, applied for federal habeas relief in 1993, asserting, *inter alia*, that the trial court: violated his constitutional rights by failing to delay trial until he could be taught sign language; and denied him due process by forcing him to trial when he was physically, and perhaps mentally, incompetent.

1.

The magistrate judge appointed counsel for Shook and set an evidentiary hearing. The State moved to rescind the hearing order, contending the evidence regarding Shook's competence to stand trial

22

had been developed fully in state court. The motion was denied. (In his post-hearing report and recommendation, the magistrate judge took the position that the presumption of correctness ordinarily accorded state fact-findings should not apply because, in his opinion, Shook was denied due process in the state court proceedings.)

At the evidentiary hearing before the magistrate judge, Shook's father and sister testified consistently with their pretrial testimony regarding Shook's communicative problems. His father testified further that: Shook passed him a note at trial stating he did not understand Griffin, the oral interpreter; at a conference in the trial judge's chambers, Griffin had told Shook's counsel that Shook was understanding only about five percent of the proceedings; and he did not believe the court proceedings could have been slowed sufficiently for Shook to be able to lipread testimony. Shook's sister testified: Griffin tried to communicate orally with Shook at trial, but Shook could not understand; Shook could not communicate with his counsel; and Shook did not understand the nature of the trial proceedings.

Shook's trial counsel testified: Shook was functionally illiterate; he did not think Shook would have understood the testimony even if the trial had proceeded more slowly or more breaks had been taken; he did not believe Shook understood enough of the proceedings to receive due process; he could not communicate with Shook, except in the most primitive fashion, and it was

23

impossible to explain to Shook legal concepts, evidentiary issues, plea bargaining, and court proceedings, including whether Shook should testify; he did not think Shook had a factual or rational understanding of the proceedings; and, in the light of Shook's hearing impairment, counsel had substantial doubt about whether Shook was physically competent to stand trial.

Shook presented the affidavits of Drs. Kellum, Bagwell, and Vernon, each of whom had testified pretrial and at trial. In addition to repeating much of the substance of her previous testimony, Kellum's affidavit stated: Shook's language skills in 1986 were so poor that he could not effectively understand communication even with the aid of a qualified interpreter; Shook lacked the communication skills necessary to consult with his attorney at trial; Shook had no factual or rational understanding of the proceedings; and a malingering diagnosis for Shook would not be valid unless the person evaluating him had extensive experience and training with the deaf and had an interpreter present during the evaluation.

Bagwell's affidavit repeated the substance of her previous testimony and added: a psychologist without adequate training in communicating with the hearing-impaired would not be able to determine whether a person was malingering concerning a hearing impairment; when she evaluated Shook in 1986, he did not have sufficient ability to consult with his attorney with a reasonable

24

degree of rational understanding and did not have a rational or factual understanding of the proceedings.

Dr. Vernon's affidavit repeated much of the substance of his previous testimony, including his opinion that, until Shook learned sign language, he was incompetent to stand trial, and his criticism of the competency evaluation performed at the Mississippi State Hospital. He added that the trial's pace could not have been slowed sufficiently for Shook to have understood the testimony.

The State presented two expert witnesses. Dr. Stringer, the Executive Director of the Mississippi Association of the Deaf, testified: when a deaf person has been educated orally, as had Shook, that is their language and signing is not done; a hearing-impaired adult who had been trained orally would need about two or three years to be trained in sign language; and he had no complaints about the assistance given Shook at trial.

Neely, the Director of Deaf Services for the Mississippi Department of Vocational Rehabilitation, testified: appointment of an oral interpreter was appropriate; he was "not certain" he would agree trial should have been delayed until Shook could learn sign language; and it would take two to three years for a person such as Shook, who had been orally educated, to learn sign language.

In a videotaped deposition submitted by Shook post-hearing, Griffin testified: Shook was a poor to fair lipreader and could follow the gist of communication if he knew the context of it and was familiar with the speaker; at trial, she communicated with

25

Shook by writing the substance of the testimony, but her sentences often had to be restructured or rephrased to accommodate his limited vocabulary, and she was often still writing about a previous witness after the next witness had begun testifying; Shook had about a third-grade reading/comprehension level; if Shook had known sign language, interpretation would have been much simpler; considering Shook's limited command of the English language and limited speech-reading abilities, she could think of nothing more that could have been done to make the proceedings clearer to him, short of extending the trial for several weeks; and she believed that, if Shook were totally immersed in a signing environment, he could learn sign language proficiently within a year. When asked whether Shook had the ability to communicate with defense counsel with a reasonable degree of rational understanding, Griffin responded that Shook could not have done so during the trial itself, because of the logistics. When asked whether Shook understood the nature of the proceedings, she testified he understood the charges against him and knew there were potential negative consequences he wished to avoid.

The magistrate judge recommended granting habeas relief based on incompetence to stand trial, stating: while it was obvious the trial court took extraordinary care in handling the matter, it erred in its competency ruling by relying on the testimony of lay persons and Mississippi State Hospital physicians who had no expertise in working with deaf persons. According to the

26

magistrate judge, the only experts worthy of the name, Drs. Vernon and Griffin, testified to Shook's "complete inability to comprehend the proceedings against him and to communicate with his attorney". The magistrate judge concluded: Shook's request to delay trial for a year in order to learn sign language was not unreasonable and should have been granted; and the failure to do so violated Shook's due process rights, by requiring him to stand trial while incompetent.

2.

The district court ruled that the record was incomplete and that another evidentiary hearing was necessary to address Shook's ability at trial to comprehend the English language in written form, inasmuch as that was the method of communication primarily used by the interpreter and others assisting Shook at trial. *See Louis v. Blackburn*, 630 F.2d 1105, 1109 & n.3, 1110 (5th Cir. 1980) (in resolving "credibility questions involved in the determination of critical fact issues affecting a [criminal defendant's] constitutional rights", a district judge may either accept the magistrate's determination or "reject[] the magistrate's decision and com[e] to an independent decision *after hearing the testimony and viewing the witnesses*" (emphasis added)).

At that second federal evidentiary hearing, Drs. Kellum and Gore testified regarding Shook's inability to communicate in written language and his lack of comprehension of the trial

27

proceedings. His trial counsel testified, repeating the substance of his testimony in the first federal evidentiary hearing, and adding: Griffin's method of communicating with Shook at trial, by taking notes during the proceedings, was not an effective method; Griffin testified at an in-chambers hearing during trial, and likewise told him repeatedly throughout trial, that Shook was not grasping what she was attempting to tell him; and he did not ask for trial recesses because it would not have made a significant difference in communicating with Shook.

Two of Shook's high school teachers testified for the State that, based on his performance in classes they taught, Shook could understand the written language. In addition to submitting written statements by two other teachers, each of whom stated Shook was able to read and comprehend written material in their classes, the State submitted Shook's academic records from Strider and NMJC, and his college entrance certificate.

Wolfe testified, consistently with her pretrial and trial testimony, regarding Shook's ability to communicate in writing. The Mississippi Highway Patrol officer who administered a written commercial driver's license examination to Shook testified about Shook's scores on that examination. The victim testified she understood the letters Shook wrote to her during their courtship.

At the conclusion of the hearing, the district court granted Shook's request to take the telephonic depositions of Griffin and Dr. Vernon, after they had reviewed the notes Griffin took during

28

trial. The depositions, taken the following month, focused on Shook's ability to understand written language.

Dr. Vernon repeated his opinion that Shook was incompetent to stand trial until he learned sign language and testified further: Shook read at a third-to-fifth grade level; Griffin's notes were written at a level in excess of Shook's abilities, and he would not have understood enough of it to adequately participate in his defense; and Shook was incompetent to stand trial based on his ability to comprehend the English language in written form. Dr. Vernon acknowledged, however, that sign language vocabulary is very limited and that there are no signs for almost all legal terms; and that, even if Shook were trained in sign language, questions would have remained regarding his ability to understand abstract legal terms.

In her telephonic deposition, Griffin testified: she communicated with Shook using a combination of writing and allowing him to speech-read, along with visual cues, gestures, and diagrams; she attempted to reword and restructure language to make it more comprehensible to him; Shook's reading comprehension level was very elementary, so she tried to write for him on a third-grade level; Shook was a very poor speech-reader and relied on written communication much more than speech-reading; she was able to communicate to Shook the gist of all of the testimony and even some of the procedural matters but not all of the detail; considering Shook's abilities and the available technology, she did not know

29

what else could have been done for him short of delaying trial so he could learn sign language; and Shook understood the charges against him and knew the proceedings could result in serious consequences. When asked whether she had the impression Shook understood the testimony while it was presented, she responded:

> I think that he did. And if he didn't, he usually let me know. And he seemed to be able to tell which people were testifying — saying things that were favorable to his case, because he would nod and smile and seemed glad about some testimony. There was other testimony given where he would shake his head and even want to refute the testimony maybe in writing to me.

The district court disagreed with the magistrate judge's finding that Griffin and Vernon both testified to Shook's "complete inability to comprehend the proceedings against him". *Shook v. State of Mississippi*, No. 2:93-CV-118-D-B, 2000 WL 877008, at *4 (N.D. Miss. 8 June 2000) (internal quotation marks and citation omitted). Although the district court did not question Dr. Vernon's expertise or credibility, it found more persuasive the totality of the testimony of all others who testified, especially Griffin's. *Id*. The district court noted that Dr. Vernon had spent less than half a day with Shook 14 years earlier and had reviewed the test evaluations made by others. *Id*. at *6. It found his testimony was "more of a generalization from studies conducted, rather than any specific observation". *Id*.

30

The district court found: Shook could communicate sufficiently with those around him to permit him to function in a reasonably normal fashion; Griffin kept Shook well informed as the trial progressed; and the trial court recognized Shook's deafness and took the appropriate steps to protect his rights by appointing an oral interpreter to aid him in the only language he had ever known. *Id*. at *5. It found Griffin's testimony "convincing as evidence of [Shook's] comprehension and his present ability to consult with his lawyer with a sufficient degree of rational understanding". *Id*. The district court concluded: the state trial court "took all reasonable measures which adequately safeguarded [Shook]'s constitutional rights"; and the trial court's finding that, with Griffin's assistance, Shook was competent, "reflects the fair-minded consideration given the facts of this case and shall be accorded absolute deference." *Id*. at *6.

## II.

Trial of an incompetent criminal defendant violates due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The standard for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Shook maintains he falls below this standard, on the basis that his

31

deafness rendered him unable to understand the proceedings against him and prevented him from consulting with, or assisting, his attorney in preparing his defense.

A criminal defendant's competency *vel non* to stand trial is a question of fact. **Maggio v. Fulford**, 462 U.S. 111, 117 (1983). The petitioner must present facts sufficient "to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to [his] mental capacity ... to meaningfully participate and cooperate with counsel". **United States v. Williams**, 819 F.2d 605, 609 (5th Cir. 1987), *cert. denied*, 484 U.S. 1017 (1988).

Because Shook filed his federal habeas petition prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA does *not* apply for review of the district court's denial of habeas relief. *E.g.,* **Slack v. McDaniel**, 529 U.S. 473, 478 (2000); **Magouirk v. Warden, Winn Corr. Ctr.**, 237 F.3d 549, 552 (5th Cir. 2001); **Lockett v. Anderson**, 230 F.3d 695, 699 (5th Cir. 2000). The AEDPA provision conditioning the ability to appeal the denial, 28 U.S.C. § 2253, does apply however. **Slack**, 529 U.S. at 478. In this regard, the district court granted Shook a certificate of appealability on the basis that "there is a close factual issue as to [Shook's] ability to comprehend and cooperate with his attorney".

Under pre-AEDPA law, state findings of fact are entitled to a presumption of correctness, *unless* they are either not "fairly support[ed]" by the record, former 28 U.S.C. § 2254(d)(8), or one of the other statutory exceptions applies. *See* **Magouirk**, 237 F.3d at 552; **Self v. Collins**, 973 F.2d 1198, 1204 (5th Cir. 1992), *cert. denied*, 507 U.S. 996 (1993).

As discussed, because the state trial court's competency determination is a question of fact, the presumption of correctness applies unless Shook satisfies an exception. *See* **Maggio**, 462 U.S. at 117. Although the district court accorded the presumption to the state trial court's competency determination, **Shook**, 2000 WL 877008, at *6, it also conducted its own evidentiary hearing, in addition to the one conducted by the magistrate judge, and, based on the additional evidence adduced at those hearings, made its own factual finding that Shook was competent to stand trial. **Id**. at *5. Accordingly, the district court's independent determination that Shook was competent to stand trial must be upheld unless it is clearly erroneous. *See* **Self**, 973 F.2d at 1203. A finding of fact "is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed". **Anderson v. City of Bessemer City**, 470 U.S. 564, 573 (1985) (internal quotation marks and citation omitted).

33

The Supreme Court has commented on the similarity between the clearly erroneous standard of review for a district court's findings of fact and the habeas presumption of correctness accorded state court findings of fact. *See Marshall v. Lonberger*, 459 U.S. 422, 434-35 (1983) ("We greatly doubt that Congress, when [, in former § 2254(d)(8),] it used the language 'fairly supported by the record' considered 'as a whole' intended to authorize broader federal review of state court credibility determinations than are authorized in appeals within the federal system itself."). "Both [standards] reflect a proper deference on the part of the reviewer to a prior fact-based determination." *United States v. Hogan*, 986 F.2d 1364, 1370 (11th Cir. 1993).

As noted, the magistrate judge recommended that the presumption of correctness was inapplicable because, in his opinion and pursuant to former § 2254(d)(7), Shook "was otherwise denied due process of law in the state court proceeding". That exception to the presumption of correctness applies, however, only if "the state court denied the petitioner a fair opportunity to press his claim". *Depree v. Thomas*, 946 F.2d 784, 788 n.6 (11th Cir. 1991). Shook was not denied due process in the state court proceedings; far from it. As amply demonstrated, *supra*, by the summary of those proceedings, the state trial court conducted fair and complete hearings on the issue of Shook's communicative abilities and his concomitant competence to stand trial. Therefore, the state

34

finding that Shook was competent is entitled to a presumption of correctness unless, pursuant to former 28 U.S.C. § 2254(d), the finding is either "not fairly supported by the record" or Shook establishes "by convincing evidence" it is erroneous.

The state court record supports the trial court's finding that Shook was competent to stand trial. Although Shook's experts, who had experience with deaf individuals, testified he was not competent, the staff at the Mississippi State Hospital, where Shook was evaluated, unanimously concluded he was. The trial judge was not required to accept the opinion of Shook's experts and to reject the opinion expressed by the Mississippi State Hospital staff, merely because the latter lacked experience in conducting competency evaluations of hearing-impaired individuals. In making a competency determination, a trial court is, of course, entitled to rely on its observations of the defendant and to judge the credibility of witnesses; and it is not required to credit the statements and ultimate conclusions of the defendant's expert, even if the expert is unimpeached and the State presents no evidence to rebut the expert's opinion. *See* **Maggio**, 462 U.S. at 113-18; *cf*. **United States v. Mota**, 598 F.2d 995, 999 (5th Cir. 1979) ("Expert testimony, even when uncontradicted, is not conclusive on the issue of sanity ... and the jury may find such testimony adequately rebutted by the observations of mere laymen."), *cert. denied*, 444

35

U.S. 1084 (1980); *United States v. Hall*, 583 F.2d 1288, 1293-94 (5th Cir. 1978) (same).

For similar reasons, the district court's independent finding that Shook was competent to stand trial, based on all of the evidence, including that introduced at the two federal evidentiary hearings, is not clearly erroneous. The district court considered Dr. Vernon's expert opinion that Shook was incompetent to stand trial but found "the totality of testimony of all others who testified, especially Ms. Griffin, more persuasive". *Shook*, 2000 WL 877008, at *4. "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

### III.

For the foregoing reasons, the denial of habeas relief is

*AFFIRMED.*